*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CF-0432

STEVEN ROBIN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF2-003264)

(Hon. James A. Crowell IV, Trial Judge)

(Argued February 19, 2025                    Decided October 16, 2025)

*Sarah McDonald*, with whom *Samia Fam* and *Shilpa S. Satoskar* were on the briefs, for appellant.

*Dylan M. Aluise*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time, and *Chrisellen R. Kolb*, *Jacqueline Yarbro*, and *Kathleen Houck*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: This case concerns an interaction between a U.S. Marshal and deliberating jurors that appellant Steven Robin contends violated his constitutional rights. At the close of evidence in Robin's trial for various offenses

related to illegally possessing a firearm, the judge instructed jurors that all trial exhibits would be sent back with the jury for examination during deliberations, save for the firearm and its ammunition. As to those items of evidence, the jurors were instructed that they could examine them only upon request, and that a marshal would bring them back and remain in the room with them during any examination, for security purposes.

What happened next can be broken down into four events that the parties did not learn about until after trial: (1) the deliberating jurors sent a note asking to see the firearm, and the judge sent the marshal back to the jury room with the gun, its detached magazine, and its ammunition; (2) a juror asked the marshal if he could "put the magazine in the gun," and the marshal either inserted the magazine himself or permitted the juror to do so; (3) the marshal added that the jurors could not load the ammunition into the firearm; and (4) the jurors then experimented with tossing the firearm in the marshal's presence, in an apparent attempt to emulate the defendant's alleged toss when discarding it. The jury found Robin guilty of all charges.

When the above came to light in the days after trial, Robin moved for a new trial primarily on the grounds that the judge should have notified the parties of the jurors' request to see the firearm and given counsel a chance to provide input on next

steps before proceeding. He also argued that the marshal's interaction with jurors was an impermissible ex parte communication at a critical stage of trial, where Robin and his counsel had a constitutional right to be present. The trial judge denied that motion, reasoning that Robin had failed to object to the process for transmitting the firearm to the jury despite it being laid out in the court's instructions. In any event, the court reasoned that the marshal's actions were "ministerial" and did not require the parties' presence or input. Robin now renews his constitutional challenges to the marshal's interaction with the jurors and contends that they require reversal of his convictions.

We disagree. Robin failed to raise any objection to the trial court's instructions regarding how the firearm would be transmitted to the jury, which fairly previewed that the marshal would oversee its safe examination. Contrary to Robin's arguments before this court, those instructions contemplated that the marshal might have to communicate with jurors about how they could and could not handle the firearm, the marshal stayed within the bounds of that contemplated role when he answered a juror's question on that topic, and the judge did not plainly err by assigning that role to him. The marshal did nothing more than what was previewed by the unobjected-to jury instructions: he permitted the jurors to examine the firearm and its magazine just as they could examine any other piece of evidence. The only sense in which the marshal restricted the jurors' examination was to preclude the

jurors from loading the weapon, a ministerial function that could not conceivably have been handled any other way. We thus discern no reversible error and affirm.

## I. Facts

*The trial evidence*

The facts underlying the offenses were recounted in officer testimony and corroborated by video evidence, and they are not in material dispute. Robin was standing at the edge of an apartment complex's parking lot as an unmarked police vehicle pulled in. Upon seeing the vehicle, Robin walked toward the rear of a parked car while grabbing his waistband. Robin then "hunched down" behind the car as if to place something underneath it, just as a second unmarked police vehicle pulled into the parking lot. Officers testified that they believed, based on how Robin grabbed at his waistband and ducked behind the vehicle, that Robin had deposited a firearm underneath it. The officers exited their cars and converged on Robin, and they then found a gun under the car.

Surveillance and body worn camera footage corroborated this account. Those videos show Robin walking to the rear of a parked vehicle. He seems to pull something from his waistband as a police vehicle enters the parking lot. Robin then ducks behind the parked vehicle, and appears to discard something underneath it as a second police vehicle pulls in. The footage likewise shows officers descending

upon Robin seconds later, placing him under arrest, and recovering a firearm from underneath the vehicle. Subsequent testing showed that Robin's DNA was on the firearm but not on the magazine in the gun's receiver. At trial, the government introduced the disassembled firearm—the receiver and its detached magazine—as one exhibit contained in one evidence bag. It also introduced the fifteen rounds of ammunition found inside the firearm as a separate exhibit in its own evidence bag.

Robin's defense was that someone else must have stashed the firearm underneath the vehicle at some earlier point, or perhaps one of the officers had planted it themselves after the fact to justify arresting Robin. Robin also presented evidence that the officers failed to follow firearm recovery protocols and offered that as an explanation for why his DNA was on the firearm. More specifically, one of the arresting officers held Robin in a bear hug mere seconds before opening the evidence bag that the gun was placed into by placing his hand and forearm into the bag. A government expert opined that the officer could have transferred Robin's DNA to the bag and thus to the gun through those actions.

*The jury instructions and verdict*

At the close of trial, the trial court instructed the jury that it would have direct access to and could examine all of the trial exhibits without limitation during its deliberations, save for the firearm and ammunition:

> I will be sending into the jury room with you the exhibits that have been admitted into evidence except for the weapon and the bullets. You may examine any or all of them as you consider your verdict.

*See* Criminal Jury Instructions for the District of Columbia, No. 2.501 (5th ed. 2024).

As to the firearm and its ammunition, the court instructed the jury consistent with the model jury instructions—and without any objections—that it could examine those upon request, but only with a U.S. Marshal present for security purposes:

> If you wish to examine the weapon please let madam clerk know and we will have a U.S. Marshal come in and bring that to you. For security purposes, the United States Marshal will remain in the jury room while each of you have an opportunity to review the evidence. You should not discuss the evidence or otherwise discuss the case among yourselves while the Marshal is present in the jury room. You may ask to examine this evidence as often as you find it necessary to do so.

*Id.*

The jury found Robin guilty on all five counts: (1) unlawful possession of a firearm by a felon, (2) carrying a pistol without a license outside the home, (3) possession of a large capacity ammunition feeding device (a magazine capable of holding more than ten rounds of ammunition), (4) possession of an unregistered firearm, and (5) unlawful possession of ammunition.

*The jury's deliberations and Robin's motion for a new trial*

Following the verdict, defense counsel learned that, about an hour into the jury's deliberations, the trial court received a jury note asking to "see the gun please." The court did not alert defense or government counsel to this note. According to the defense's post-verdict interviews with jurors, a marshal then brought the firearm along with its magazine and ammunition back to the jury room and remained with the jurors while they examined those exhibits. One of the jurors asked "if the Marshal could put the magazine in the gun," and the marshal acceded by either inserting the magazine into the receiver himself, or by permitting a juror to do so. The marshal added that the jurors could not load the ammunition into the gun, though there was no suggestion that any juror asked about or tried to do that. A juror then conducted a demonstration with the assembled but unloaded weapon with the apparent goal of testing whether Robin could have tossed the gun as far under the vehicle as where it was recovered in the brief time he was seen hunched behind the vehicle.

Robin moved for a new trial. His proffer included the above facts and several others of note that defense counsel learned from interviewing the jurors: (1) one juror "wondered how [Robin's] DNA could be on the firearm but not on the magazine"; (2) the jurors' demonstration with the assembled firearm in the

marshal's presence was purportedly "integral to the jury reaching its verdict," because it revealed that it could quickly be tossed as far under the vehicle as where it was recovered, near the center of the car's undercarriage; and (3) prior to that demonstration, some jurors initially doubted whether Robin would have been able to so quickly toss the firearm so far under the vehicle in the single quick motion shown on the surveillance footage.

Robin's principal complaint in his new trial motion was with the court's failure to alert counsel that jurors had requested to see the firearm. In his view, the court's failure to "inform[] the defense of the jury's note" asking to see the gun constituted "structural error" mandating reversal. He also argued that the marshal's particular interaction with jurors, permitting them to conduct demonstrations with the firearm when it was not "in the same state it was in at the time it was recovered"—i.e., it was unloaded—"violated Mr. Robin's due process rights and right to be present during every stage of his trial."

The trial court disagreed and denied Robin's motion for a new trial. The court did not hold an evidentiary hearing and instead accepted the proffered facts from Robin's motion for a new trial as true. The court concluded that Robin "failed to raise a timely objection to the procedure for jury examination of the firearm, which was thoroughly detailed in the jury instructions provided to the parties well ahead of

the Court providing those instructions to the jury prior to closing argument." The marshal's only alleged communication with jurors had been to explain "for safety reasons, what he could and could not do with the firearm as they examined it," to wit, "that he could load the magazine but could not load the bullets." Relying on *Rushen v. Spain*, the court found that this communication did not warrant a new trial because it did not touch on "any fact in controversy or any law applicable to the case," so that the marshal served only in an appropriate "ministerial" role. 464 U.S. 114, 121 (1983) (per curiam). The court explained that it would not have done anything different from what the marshal did, because "the jury was entitled to examine the firearm" including by "conduct[ing] demonstrations" with it "to gauge the validity" of the government's case. In sum, the court denied Robin's motion for a new trial because Robin did not object to the marshal's role in transmitting the evidence, the marshal did not exceed that role, and that role was one that could be appropriately delegated to the marshal.

Robin now appeals.

## II. Analysis

We review the denial of a motion for a new trial for abuse of discretion but consider the trial court's underlying legal conclusions de novo. *Greene v. United*

*States*, 279 A.3d 363, 368 (D.C. 2022); *Dickens v. United States*, 163 A.3d 804, 814 (D.C. 2017).

Robin raises several distinct but related claims. He argues that what happened during the jurors' deliberations violated his rights (1) to be personally present, (2) to be counseled, and (3) to have judicial oversight at a critical stage of his criminal prosecution, in violation of the Fifth and Sixth Amendments as well as Superior Court Criminal Rule 43. *See Euceda v. United States*, 66 A.3d 994, 1006 (D.C. 2013) ("Rule 43(a) 'incorporates the protections afforded by the Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common law right of presence.'") (quoting *Welch v. United States*, 466 A.2d 829, 838 (D.C. 1983)). While these rights all have slightly different contours, their differences are immaterial for purposes of this appeal, so we consider them collectively.

The pivotal questions underlying Robin's claims on appeal are (1) to what extent he waived or forfeited his complaints by failing to object to the jury instructions previewing how the marshal would transmit and monitor the firearm's examination for security purposes, and, because we conclude Robin at least forfeited

his claims,[1] (2) whether the trial court nonetheless committed plain error.  We now address those issues in turn.

## A. *Robin's claims are, at best, forfeited.*

Before diving into whether Robin's claims are preserved, forfeited, or waived, we detail the precise claims he is and is not raising on appeal, because they have morphed somewhat from his claims before the trial court.  Recall that the marshal's interaction with jurors can be broken down into four events: (1) the trial court responded to the jury note, without consulting the parties, by sending the firearm exhibits back to the jury room with the marshal; (2) the marshal permitted the magazine to be inserted into the receiver, or inserted it himself; (3) the marshal told jurors they could not load the ammunition into the gun; and (4) the marshal stood by as the jurors conducted demonstrations with the firearm.  Robin principally

---

[1] Generally, an issue that has been knowingly, intelligently, and voluntarily waived is "unreviewable on appeal absent a showing of good cause"; but when claims are simply unraised, as opposed to being affirmatively waived, the party has merely "forfeited his right to have this court consider on direct appeal the 'merits' of [the] claim[s] under the court's regular standard of review." *Chew v. United States*, 314 A.3d 80, 83 (D.C. 2024) (quoting *Allen v. United States*, 495 A.2d 1145, 1151 & n.11 (D.C. 1985) (en banc)); *see also id.* at 91 (Easterly, J., concurring) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))).  Forfeited claims "remain reviewable by this court subject to the strictures of plain error review" in criminal appeals. *Id.* at 83.

complained about the first step in that process before the trial court, though it is fair to say he raised some complaint about each step in that process.

Robin now challenges only the second and third steps above, concerning the marshal's communications with jurors in which he allowed the magazine to be inserted into the receiver with the caveat that the ammunition could not be loaded.[2] That is, Robin has abandoned on appeal any argument that the trial judge had to consult with the parties before responding to the jury note, and he likewise makes no argument that the judge erred by having the marshal stay with the jurors during their examination of the firearm. He expressly concedes that he "agreed that the marshal could bring the firearm to the jurors" and "remain in the jury room while the jurors reviewed the evidence." As Robin puts it, he does "not challenge the trial court's handling of the jury note asking to see the firearm" by sending the marshal back to the jury room with it.

---

[2] We refer to these as the marshal's communications with jurors despite the uncertainty about whether the marshal verbally authorized a juror to insert the magazine or instead simply inserted the magazine himself. In either case—whether the marshal told the juror they could insert the magazine or the marshal did that himself—it is fair to say the marshal communicated with the juror that he had no problem with the magazine being inserted into the firearm.

That leaves Robin with his challenges to the marshal's communications with jurors at the second and third steps outlined above, and the extent to which those challenges are preserved, forfeited, or waived.

The government argues that Robin has "waived" his present challenges because he "acquiesced to these procedures" permitting the marshal to oversee the firearm's safe handling after they had been previewed in the jury instructions. Several binding precedents support the government's view that "a defendant's 'failure either to request that he be present during the portions of the proceedings which took place in his absence or to object to his exclusion therefrom constitutes a waiver of that right and forecloses the opportunity to be heard on appeal.'" *Lay v. United States*, 831 A.2d 1015, 1021 (D.C. 2003) (quoting *Welch*, 466 A.2d at 839)); *Fortune v. United States*, 59 A.3d 949, 958-59 (D.C. 2013) ("Fortune waived his right to be present" when he did not assert it in response to "portions of voir dire that were conducted at the bench" in his absence); *see also United States v. Gagnon*, 470 U.S. 522, 529 (1985) (a defendant "need not be expressly warned of" his right to be present, nor do courts "require any type of [express] waiver to exist on the record," because their "total failure to assert their rights to attend" a stage of the proceedings that has been previewed for them "constitutes a valid waiver of that right").

Robin offers two counters. First, he argues that he did not forfeit or waive any objection to this process because the court's instructions never indicated that the marshal might field questions from the jurors. Because the jurors were instructed that they "should not discuss the evidence or otherwise discuss the case" with the marshal present, he could not have fairly anticipated the marshal's exchange with jurors and thus could not have forfeited or waived any objection to those interactions. In Robin's telling, he raised his objections at the first reasonable opportunity, which was after trial when he first learned of the marshal's interaction with jurors, and we should thus treat these claims as preserved. Second, Robin stresses that, regardless of whether he waived his right to presence claims, he also asserts a right to judicial oversight over a critical stage of trial. He suggests that such a claim cannot be waived, so that we should at least review his claims under the "plain error" standard of review applicable to forfeited errors. And in Robin's view, the trial court committed plain error by delegating questions about the firearm's safe handling to the marshal, or framed slightly differently, the marshal committed plain error by usurping the judge's crucial role in responding to a juror's question.

Contrary to Robin's arguments that he "never agreed to have the marshal make unilateral decisions about how the jury could review the firearm," the court's instructions allowing the jury to ask to "examine the weapon" with the marshal standing by for "security purposes" fairly previewed just that, and he voiced no

objection to that process. It is entirely foreseeable that a person charged with overseeing the safe examination of a firearm might need to communicate with others about what, within the bounds of safety, they can and cannot do with the firearm. For instance, if one of the jurors had attempted to leave the deliberation room out into the public corridor with the firearm in tow, of course the jury instructions would have authorized the marshal to stop them in their tracks. Similarly, if one of the jurors had attempted to load the firearm with ammunition, the court's instructions also clearly authorized the marshal to prevent them from doing that. It is very difficult to conceive of how the marshal could have served any real security function if he could not intercede, verbally or otherwise, to stop such dangerous conduct.

It is just as foreseeable, as the instructions also fairly previewed, that the marshal would not stand in the jurors' way if he had no safety concerns with how they wished to examine the firearm, i.e., that he would permit the jurors' desired examination so long as it did not raise a safety concern. The trial court's instructions told jurors that they could "examine any or all" of the exhibits, without placing any limitations on how they could conduct those examinations. So if Robin took issue with that—and, as he now argues, believed that inserting the magazine into the receiver somehow constituted an impermissible "alter[ation]" of the evidence[3]—he

---

[3] Putting a magazine in a receiver does not impermissibly alter those items any more than putting a ball in a glove or a key in a lockbox does. *See State v.*

had plenty of notice that jurors might do that on their own and he could have objected and sought to confine their examination in some respect.

Indeed, Robin seems to concede that, if a juror had simply picked up the firearm and put its magazine in without seeking the marshal's pre-approval, he would have no viable challenge to that, even though the marshal's passivity would in some sense have authorized the juror's actions. Robin stressed at oral argument that "the question" from the juror seeking permission to insert the magazine "is what matters" to his present claims. But we do not see any meaningful difference between the marshal passively permitting a juror to insert the magazine into the firearm and actively authorizing that conduct, nor could such a trivial distinction be of constitutional import, as Robin maintains. In either case, Robin could have foreseen jurors inserting the magazine into the firearm under the court's instructions, and he did not object to that.

---

*Castellanos*, 935 P.2d 1353, 1354 (Wash. 1997) (en banc) ("[E]xhibits taken to the jury room generally may be used by the jury as it sees fit."); *Bogle v. Galaza*, 38 F. App'x 437, 438 (9th Cir. 2002) (unpublished) (jury was permitted to experiment by inserting a key into the lock of a safe because both items were in evidence and a "jury is permitted to examine all pieces of evidence carefully . . . and to reenact the crime using the evidence before it"). Jurors are permitted broad leeway in examining exhibits, and putting one exhibit into another—at least when it can just as readily be removed again—is not an alteration of the evidence in any relevant sense.

In short, the jury instructions fairly previewed that the marshal might make some judgment calls, and communicate with jurors either actively or passively, about how they could and could not safely handle the firearm. Robin had a fair opportunity to object to that process, and to request more rigid oversight of it, and he failed to do that. Thus, the best case scenario for him is that he has forfeited his claims so that we should review them only for plain error. While the government argues that we should not review these claims at all because Robin has waived them, we need not resolve that question because, as we now explain, we discern no plain error in any event. *Chew*, 314 A.3d at 83 (declining to decide whether the defendant's claims were waived and therefore unreviewable absent good cause, or forfeited and therefore subject to plain error review, because the claims failed even under plain error review).

B. *The court did not plainly err by delegating any judicial function to the marshal.*

That leaves the question of whether the trial court committed plain error by delegating some limited oversight of the firearm's safe handling to the marshal.[4] To

---

[4] Robin alternatively frames the question at times as whether the marshal usurped the trial court's judicial function when he answered a juror's question. While the difference between the two framings is subtle, we view the relevant question for us as whether the trial court plainly erred in delegating the safe handling of the firearm to the marshal. As we have already explained, the court's instructions fairly contemplated that the marshal could make some limited judgment calls and communicate them with jurors on the discrete subject of the firearm's safe handling.

establish plain error, Robin has the burden of demonstrating (1) error, (2) that is "plain," (3) that affects his "substantial rights," and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993). Robin's claims fail at the second prong of this analysis because, even if we give Robin the benefit of the doubt and assume that the trial court erred in some respect, that error was not plain, which is to say it was not "clear and obvious." *Chew*, 314 A.3d at 83.

First, it is not at all clear that answering a juror's question about the safe handling of an exhibit qualifies as a "critical stage" of trial at which judicial oversight and party input is always required. *See Gomez v. United States*, 490 U.S. 858, 876 (1989) (explaining that the right to have a "criminal trial conducted by a [judge] with jurisdiction to preside" applies to "all critical stages" of the trial). There is not a lot of caselaw on that topic, but the government cites to some reasonably persuasive authority permitting courthouse security some leeway to address security concerns regarding an exhibit's handling without the judge's involvement because

---

Any argument claiming that the marshal usurped the trial judge's role would fail by virtue of the fact that the trial court, in some limited respect, ceded that role. Had the marshal been acting of his own accord without any judicial authorization for him to transmit the firearm and remain in the jury room with it for security purposes— or had he taken it upon himself to answer a note that the jury had intended for the judge—that would be better described as a usurpation of the judge's role, and this would be a very different case.

answering such questions does "not convey any legal instruction or impart any information to the jurors about the trial evidence." *People v. Kelly*, 11 A.D.3d 133, 143-44 (N.Y. App. Div. 2004) (finding court officer did not usurp judicial authority where he unilaterally declined to allow jurors to handle evidentiary bayonet out of concern for their safety). To be sure, as Robin highlights, some security matters are so entangled with a defendant's right to a fair trial that a judge will err by delegating the matter to security personnel and failing to directly oversee them, such as whether the defendant will be shackled in the jury's presence. *See De Béarn v. United States*, 237 A.3d 105, 109-10, 109 n.7 (D.C. 2020) (holding that trial court abused its discretion by giving "unquestioning" deference to the marshal "as to the appropriateness of shackling" in the courtroom, and collecting cases). But this case does not obviously raise such fairness concerns.

In permitting jurors to examine the firearm by putting its component parts together, the marshal did not overstep the authority the trial court delegated to him; he did nothing more than render himself a non-entity. The trial court's instructions already and without any objection permitted the jurors to examine the exhibits however they wished, subject only to the marshal's security concerns, and he simply had none about inserting the magazine. *See State v. Elmore*, 985 P.2d 289, 296 (Wash. 1999) (en banc) ("[O]nce admitted into evidence, an exhibit may be used by the trier of fact in whatever fashion it chooses," and "[a]ny objection to the exhibits

admission or its use by the trier of fact must be articulated"); *Taylor v. Commonwealth*, 17 S.E. 812, 815-16 (Va. 1893) (where trial judge, with parties' consent, agreed to send gun to jury room and did not provide any further instruction as to how they should examine it, "[t]he jury had the right to take the gun apart" to inspect if it had been tampered with).[5] This might be a harder case if the marshal had stopped the jurors from conducting their desired examination without raising the issue for the judge, but that is not what happened here; the marshal permitted the jurors to examine the firearm as they wished.

While the marshal did preclude the jurors from doing one thing that none of them had expressed an interest in doing when he said they could not load the firearm, that was the "preordain[ed] . . . single permissible conclusion" on that topic, so it did not require the exercise of any judicial discretion. *(James) Johnson v. United States*, 398 A.2d 354, 361 (D.C. 1979); *see also Walker v. United States*, 982 A.2d 723, 741 (D.C. 2009) (A "defendant has no right to be present when presence would be useless, or the benefit but a shadow.") (quoting *Frye v. United States*, 926 A.2d 1085, 1103 (D.C. 2005)); *Quarles v. United States*, 349 A.2d 690, 692 (D.C. 1975) ("[T]he

---

[5] We attach no significance to the record uncertainty about whether the marshal inserted the magazine himself or instead permitted a juror to do that. Given that all but one of the jurors seemed to have no memory of whether the marshal or a fellow juror inserted the magazine, there is no basis to say the marshal conducted anything that could fairly be described as a "demonstration" of how to insert the magazine, as Robin sometimes describes it, in either case.

transmission of items in evidence is a ministerial activity which can be delegated by the trial court" and generally does not implicate the right to presence).

Second, the trial court's instructions permitting the marshal to oversee the firearm's safe handling tracked the model criminal jury instructions, and "[a]n instruction that follows without objection the model criminal instruction would constitute an error that is 'plain' only in an unusual case." *Cousart v. United States*, 144 A.3d 27, 30 (D.C. 2016); *but see Buskey v. United States*, 148 A.3d 1193, 1209 n.11 (D.C. 2016) (noting that "[t]he structure and location of the jury instructions . . . makes this an 'unusual case'" in which it was error to issue the model instructions). The court read instruction No. 2.501 to the jurors virtually verbatim, with only the most trivial tweaks (like replacing "clerk" with "madam clerk"). As we have explained, a plain reading of that instruction permitted the marshal to offer some guidance to jurors on the firearm's safe handling, and the marshal stuck to that narrow role. While model instructions are not binding authority, and we have occasionally held that a trial court has erred or even plainly erred by issuing one, this instruction's endorsement in the model instructions is at least some weight against finding it to be plainly erroneous. *Cousart*, 144 A.3d at 30.

Robin counters that it is plain error for court staff to answer any question from a deliberating jury that does not have a "ministerial" response, which he posits means

any response that is not preordained. *See Johnson*, 398 A.2d at 361. And because a judge "could have answered the juror['s] question[]"[6] about inserting the magazine "in multiple different ways"—for instance, he might have precluded them from inserting the magazine, or permitted them to do so with an accompanying cautionary instruction of some sort—Robin contends that the marshal plainly exceeded any ministerial function.

That is far too cribbed a view of what qualifies as a ministerial function that can be carried out without judicial oversight. Court staffers often answer deliberating jurors' questions even when there is no preordained answer—"How do we send a note to the judge?"; "Can I use the restroom?"; "Can I vape in here"; "What time do we finish deliberations today?"; "Can we turn down the AC?"; "What's the weather like outside?"—and there is nothing improper about that. "[T]he mere occurrence of an ex parte conversation" with jurors "does not constitute a deprivation of any constitutional right," as there is "scarcely a lengthy trial in which" some number of those conversations do not take place. *Gagnon*, 470 U.S. at 526, 528 (quoting *Rushen*, 464 U.S. at 125-26 (Stevens, J., concurring)).

---

[6] Robin's briefs repeatedly refer to the marshal answering the "jurors' questions," but Robin's proffer was that there was only one question and it came from a single juror: A juror asked "the marshal if the marshal could put the magazine in the gun," and the marshal did that (or allowed it to happen), with the caveat that jurors could not load the ammunition.

Robin persists that whatever allowance is made for non-judges answering such wholly tangential questions even when they call for some discretion, the same allowance does not extend to questions about key pieces of evidence like the firearm here. That again paints with too broad a brush. It is not hard to imagine questions directly related to the firearm that the marshal could have appropriately answered without implicating any judicial function: "Is that the gun?" ("Yes."); "Is it loaded?" ("No."); "Is its safety engaged?" ("Yes," presumably). We might add "can we load the ammunition," since the negative response to that seems preordained even under Robin's test for what constitutes a ministerial function, which is no doubt why Robin focuses his argument almost entirely on the marshal's decision to permit the magazine to be inserted.[7]

---

[7] While Robin does not suggest there was any possibility that jurors might have been permitted to load the ammunition, he does argue that the judge might have accompanied the denial of such a request with a cautionary instruction, like telling jurors to be aware that at the time of recovery the gun was loaded and therefore marginally heavier than it would be without ammunition. But whether the judge might have tacked on such a cautionary instruction cannot be the relevant test of when judicial oversight is required—a judge could always accompany even preordained answers with further explanations, so that nothing would be ministerial under Robin's test.

That aside, Robin focuses his challenge almost entirely on the marshal's decision to permit the insertion of the magazine, which he stresses "did not keep the jurors any safer." It is true enough that permitting the magazine's insertion did not make the jurors or the firearm any safer, but we fail to see the relevance of that—bringing the gun into the jury room, and permitting the jurors to take it out of the evidence bag and examine it, did not make them or it any safer either. The marshal

We will not hazard a precise definition of what constitutes a ministerial matter that can be addressed without judicial involvement versus a substantive one that requires judicial oversight, given that we are reviewing only for plain error. Here, it suffices to say that the trial court's view on that topic was not plainly wrong, and under it the juror's question did not plainly require a judicial response. Quoting *Rushen*, the trial court reduced the relevant question to whether the juror's question concerned "fact[s] in controversy or any law applicable to the case" and concluded that it did not. *Rushen*, 464 U.S. at 121; *see also Gagnon*, 470 U.S. at 526 (defendant's right to presence attaches where it "has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge" (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934))). The best understanding of the juror's question here was that it was not seeking guidance on any facts in dispute or any legal question, and it did not implicate Robin's ability to defend against the charges in any substantial way. It was simply a question about whether jurors could safely insert the magazine into the receiver, which the jury instructions already

---

was not charged with maximizing safety at all costs, but was instead charged with permitting the jurors to conduct their desired examination of the firearm to whatever extent safety permitted. While one could reasonably carry out that charge in different ways, that bit of discretion does not obviously transform the juror's question into one that required a judicial response.

seemed to permit absent some security concern, and that question did not obviously require judicial resolution.

Robin next attempts to liken this case to several precedents that found a constitutional violation when somebody other than the judge answered a jury note, or the judge answered that note without consulting with the parties about it. Each of those cases is far afield because the jurors were clearly seeking legal guidance—the type of thing only a judge could offer—by sending notes directly to the court on matters that were far more obviously legal in nature than the juror's safety-related question posed to the marshal here. *See Euceda*, 66 A.3d at 1007-08 (error for clerk to answer jury note inquiring about the elements of an offense); *(Orlando) Roberts v. United States*, 213 A.3d 593, 596-97 (D.C. 2019) (error for judge to respond to jury note about apparent deadlock without permitting defense counsel to see contents of the note); *Hallmon v. United States*, 722 A.2d 26, 27 (D.C. 1998) (error for clerk to answer jury note in the negative, asking for "a copy of the jury instructions on the law"); *Winestock v. United States*, 429 A.2d 519, 528 (D.C. 1981) (error for judge to answer jury note asking for trial transcript and post-arrest statement without consulting the parties); *(Isaac) Roberts v. United States*, 402 A.2d 441, 442-43 (D.C. 1979) (error for judge to respond to jury's note seeking clarification of self-defense standards without hearing from the parties).

To be clear, we agree with Robin that the mere fact that the jurors in this case posed their question orally to a marshal, rather than putting it in a note addressed to the court as the jurors did in each of the above cases, does not by itself dictate whether their question had to be redirected to the judge. Of course jurors might orally pose a legal question to a marshal or a court clerk—for instance, they could ask for guidance about the elements of an offense—and it would be clearly improper for the marshal or the clerk to answer such a question rather than relaying it to the judge. The point is that, on its face, the discrete juror question at issue in this appeal does not appear to be seeking any legal guidance, but instead seems to raise only a question about how jurors could safely handle the firearm. The fact that a juror posed that question orally to a marshal rather than in a note to the judge—despite the jurors' demonstrated familiarity with how to send a note to the judge—is just some confirmation that they were asking a safety-related question, rather than one concerning the facts or the law in the underlying case. Had the same question been posed to the judge via note, we do not doubt that it would have been plainly improper for the marshal to intercept that note and answer it himself per the precedents Robin highlights. In that case, the note would have evinced that jurors were seeking some legal guidance or clarification of the jury instructions from the judge, rather than simply asking a question about how to safely handle the firearm.

While a jury's safety-related questions can undoubtedly cross the line into legal questions that must be directed to a judge, this one did not obviously cross that line. So, we discern no plain error where the trial court permitted the marshal to oversee the firearm's safe handling during jury deliberations, nor do we think the marshal clearly acted outside of that contemplated role when answering a juror's question by permitting them to insert the unloaded magazine into the receiver. In the face of a single safety-related question posed by a juror, the marshal effectively stood down and permitted the jurors to conduct their desired examination, just as the jury's instructions previewed that they might do with any of the evidentiary exhibits.

## III. Conclusion

For the foregoing reasons, we affirm Robin's convictions.

*So ordered.*